UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X

**Rami N.I. Tawfik**, et al.          :

           Plaintiffs,     :

   -against-                 :     11 Civ. 6455 (ALC) (JCF)

                               :     <u>**OPINION & ORDER**</u>

**Sheikh Sabah al-Ahmad al-Jaber al-Sabah**,  :

                               :

           Defendant.      :

---------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8-16-12

**ANDREW L. CARTER, JR., District Judge:**

Currently before the Court in this action brought under the Torture Victim's Protection Act of 1991 (the "TVPA") and the Alien Tort Claims Act is (1) United States Magistrate Judge James C. Francis' Report and Recommendation (the "Report") recommending that the Complaint be dismissed for lack of subject matter jurisdiction (ECF # 27), (2) plaintiffs' Objection to the Report ("Objection") (ECF # 30), and (3) the subsequent letter responses from the parties thereto. (ECF ## 31, 32, 33, 34, 37, 38.)  For the following reasons, I agree with the Report's conclusion that the Complaint be dismissed.

## I. BACKGROUND

The plaintiffs are Egyptian citizens and supporters of the Egyptian Association for Change, "a political organization dedicated to the democratization of the political process in

1

Egypt through peaceful means." (Compl. ¶ 7, ECF #1.) In 2010, the Egyptian Association for Change had branches in several countries, including Kuwait, where the plaintiffs resided at that time. (Id.) In April 2010, Kuwaiti secret police arrested the plaintiffs, allegedly pursuant to the orders of Defendant Sheik Sabah al-Ahmad al-Jaber al-Sabah, the Emir and sitting head of state of the State of Kuwait ("the Emir"), and two of his former co-defendants ("the Sheikh Defendants").[1] (Id. at ¶ 8.) The plaintiffs allege they were arrested at the request of Hosni Mubarak, who was then the President of Egypt, and also because "the Sheikh Defendants viewed the democratic ideals of the Egyptian Association for Change as a possible threat to their continuation in power." (Id.)

According to the Complaint, following their arrests, the plaintiffs were forced to endure horrific violations of United States and international law. Each plaintiff was detained in solitary confinement, "in a filthy, cockroach infested, windowless cell," in which the "lights were kept on . . . 24 hours a day" and the only toilet was a hole in the floor observable via closed-circuit camera. (Id. at ¶ 9.) The plaintiffs were held entirely incommunicado and were refused legal counsel and consular services. (Id. at ¶ 10.) The plaintiffs also suffered severe torture, including, but not limited to, sleep deprivation; beatings and canings that resulted in permanent injuries; threats of electrocution, castration, anal rape, and harm to relatives; and the deprivation of necessary medical treatment. (Id. at ¶¶ 11, 12, 13, 14, 15.) None of the plaintiffs was ever charged with any crimes or brought before any judicial officer. (Id. at ¶ 10.) When they were eventually released, the plaintiffs were deported from Kuwait to Egypt even though they had been lawfully working and residing in Kuwait. (Id. at ¶¶ 17, 18.) The plaintiffs continue to

---

[1] These former co-defendants are Sheikh Nasser Sabah Al-Ahmed Al-Jaber Al-Sabah, the Head of the Royal Council, and Sheikh Jaber Khalid Al-Jaber Al-Sabah, the Kuwaiti Minister of Interior.

2

suffer physical, psychological, and economic harm as a result of the torture inflicted upon them and their subsequent deportation. (Id. at ¶¶ 16, 17, 18.)

In September 2011, the plaintiffs filed suit against several defendants, including the Emir, the Sheikh Defendants, and two officers in the Kuwaiti Ministry of Interior, alleging violations of the TVPA and the Alien Tort Claims Act. On December 14, 2011, the plaintiffs obtained a certificate of default against the Emir. (ECF # 8.) Shortly thereafter, pursuant to the plaintiffs' request, claims against all of the other defendants were dismissed without prejudice. (ECF # 11.) The plaintiffs then sought an inquest on damages. Prior to any such hearing and in response to an inquiry by Magistrate Judge Francis, the United States submitted a Suggestion of Immunity on April 5, 2012, on behalf of the Emir as the sitting head of a foreign state. (ECF # 23.)[2]

On April 27, 2012, Magistrate Judge Francis issued his Report, recommending that the Court dismiss the plaintiffs' claims against the Emir for lack of subject matter jurisdiction. On May 11, 2012, the plaintiffs filed their Objections to the Report.[3]

When specific objections are made to a magistrate judge's report and recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1)(C). After

---

[2] The State Department's Suggestion of Immunity was made in response to Kuwait's formal request that the State Department find the Emir immune to suit. (Letter of Harold Hongju Koh dated March 28, 2012, attached as Exhibit A to Suggestion of Immunity.)

[3] On May 7, 2012, prior to the Plaintiffs' Objection being filed, defendant submitted a letter requesting that I adopt Judge Francis' Report. (ECF # 32.) On May 16, 2012, defendant submitted another letter, this one in response to Plaintiff's Objection. (ECF # 31.) On May 24, 2012, the government submitted its response to Plaintiffs' Objections. (ECF # 33.) On May 24, 2012, Plaintiff wrote in response to defendant's May 16 letter. (ECF # 34.) On June 6, 2012, Plaintiff wrote in response to the government's May 24 letter. (ECF # 37.). Finally, on July 6, 2012, Defendant wrote in response to Plaintiff's latest filing. (ECF # 38.)

conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## II. DISCUSSION

The United States submits that its determination that the Emir is entitled to head of state immunity is "controlling and is not subject to judicial review." (Suggestion of Immunity at 2.) Plaintiffs contend that the plain language of the TVPA and its legislative history bar the application of head of state immunity to the claims against this particular defendant, and object to the Report's "silen[ce] on the effect of the TVPA on the usual common law rule of head-of-state immunity." (Objection at 2.) In his Report, Judge Francis agreed with the United States and concluded that the court was bound by the State Department's Suggestion of Immunity. As explained below, the Court agrees that the State Department's Suggestion of Immunity results in dismissal in this case, but does not—and need not—adopt a broader holding that the Executive Branch's determination is perforce "controlling" and "not subject to judicial review."

### A. Foreign Sovereign Immunity and Suggestions of Individual Immunity

In Samantar v. Yousuf, the Supreme Court held that the Foreign Sovereign Immunity Act (the "FSIA"), 28 U.S.C. §§ 1602, et seq., governs only the application of foreign sovereign immunity to foreign states but not to foreign officials. ___U.S.___, 130 S.Ct. 2278, 2292–93 (2010). In Samantar, the Court found that in enacting the FSIA Congress wanted to preserve "the State Department's role in determinations regarding individual official immunity," a procedure that developed as a matter of common law. Id. at ___, 130 S.Ct. at 2291 & 2291 n.

19. Accordingly, the Court held, suits against foreign officials "may still be barred by foreign sovereign immunity under the common law." Id. at ___, 130 S.Ct. at 2292.

The common law of foreign sovereign immunity is, perhaps uncharacteristically, facile and straightforward: if the State Department submits a "Suggestion of Immunity," then the district court "surrender[s] its jurisdiction." Id. at ___, 130 S.Ct. at 2284 (quoting Ex parte Peru, 318 U.S. 578, 581, 587–88, 63 S.Ct. 793, 87 L.Ed. 1014 (1943)).[4] This procedure developed from the seminal Supreme Court decision Schooner Exchange v. McFaddon, 7 Cranch 116, 3 L.Ed. 287 (1812). Chief Justice Marshall's opinion in Schooner Exchange "was interpreted as extending virtually absolute immunity to foreign sovereigns as 'a matter of grace and comity.'" Samantar, ___ U.S. at ___, 130 S.Ct. at 2284 (citing Verlinden, 461 U.S. at 486). Since then, notwithstanding "the dearth of pre-FSIA authority distinctly addressing head of state immunity,"[5] courts have extended this procedure beyond immunizing seized vessels to include immunizing individual foreign officials. Id. at ___, 130 S.Ct. at 2284–85. In fact, it appears that pursuant to this common law procedure no court has subjected a sitting head of state to suit after the State Department has determined that the head of state is immune. See, e.g., Wei Ye v.

---

[4] But see Tachiona v. Mugabe, 169 F. Supp. 2d 259, 304–05 (S.D.N.Y), rev'd and vacated on other grounds, Tachiona v. U.S., 386 F.3d 205 (2004). In this case, the district court recognized the potential separation of powers concerns when a district court affords such broad deference to the Executive Branch over a judicial proceeding:

> [T]he scope of head-of-state immunity is a matter for 'reasoned judicial interpretation in the light of experience and by sound application of the emerging common law, rather than by reflexive expansion of the executive branch's categorical reading of a limited doctrinal exception. . . . Nothing in the evolution of the common law doctrine suggests that [it] also encompassed conferring upon the State Department the function of defining the full reach of the concept of inviolability as it pertains to heads of state.

Id. Apparently, this approach has not carried the day, at least with regard to a Suggestion of Immunity over a sitting head of state.

[5] Tachiona, 169 F.Supp.at 269–70.

5

Zemin, 383 F.3d 620, 626 (7th Cir. 2004) (President of China); Manoharan v. Rajapaska, --- F.Supp.2d---, No. 11-cv-235 (CKK), 2012 WL 642446 (D.D.C. Feb. 29, 2012) (President of Sri Lanka); Habyarimana v. Kagame, 821 F.Supp.2d 1244 (W.D. Okla. 2011) (President of Rwanda); Al-Hassan v. Al Nahyan, No. 09-01106 (C.D. Cal. Sept. 17, 2010) (unreported) (Prime Minister of Grenada); Doe I v. State of Israel, 400 F.Supp.2d 86 (D.D.C. 2005) (Prime Minister of Israel); Leutwyler v. Office of Her Magesty Queen Rania Al-Abdullah, 184 F.Supp.2d 277 (S.D.N.Y. 2001) (Queen of Jordan); Tachiona v. Mugabe, 169 F.Supp.2d 259 (S.D.N.Y. 2001), aff'd on other grounds sub nom., Tachiona v. United States, 386 F.3d 205 (2d Cir. 2004) (President of Zimbabwe); Lafontant v. Aristide, 844 F.Supp. 128 (E.D.N.Y. 1994) (President of Haiti).[6]

Thus, it is clear that in the common law context, at least as applied to sitting heads of state, "[courts] defer to the Executive's determination of the scope of immunity." Matar v. Dichter, 563 F.3d 9, 15 (2d Cir. 2009). Therefore, unless and until Congress[7] (or a higher court) states otherwise, the State Department's determination that the Emir is immune from suit is controlling here. See Samantar, __ U.S. at __, 130 S.Ct. at 2285 (acknowledging that Congress, by passing the FSIA, replaced the pre-existing common law in determining whether a foreign state is entitled to sovereign immunity).

---

[6] See Lewis S. Yelin, 44 VAND. J. TRANSNAT'L L. 911, 991 & Appx. A (2011); see also Government's Letter of May 24, 2012, at 2–3 (ECF # 33).

[7] "In order to abrogate a common-law principle, [a congressional] statute must 'speak directly' to the question addressed by the common law." U.S. v. Texas, 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L. Ed. 2d 245 (1993) (quoting Mobile Oil Corp. v. Higginbotham, 436 U.S. 618, 625, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978)); see also Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.").

**B. The Torture Victim Protection Act and Individual Head of State Immunity**

The TVPA provides:

An individual who, under actual or apparent authority, or color of law, of any foreign nation—

>(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
>
>(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

TVPA § 2(a), Pub. L. No. 102-256 (codified at 28 U.S.C. § 1350 note). Plaintiffs argue that the TVPA modifies the Executive's authority to make immunity determinations in the case at bar. Specifically, plaintiffs contend that the plain text and legislative history of the TVPA make clear that "Congress intended that the TVPA would apply to 'any individual' except a diplomat or head of state who is 'visiting the United States on official business.'" (Objection at 2.) Plaintiffs argue that since the Emir has a residence in the United States, he is not "visiting" the United States. Therefore, plaintiffs conclude, the TVPA should apply to the Emir.

However, whether Congress intended the TVPA to apply in this case—i.e., to a sitting head of state with a residence in the United States—is separate from "the antecedent question" of whether Congress, in passing the TVPA, intended to modify the common law of foreign sovereign immunity. Cf. Samantar, __ U.S. at __, 130 S.Ct. at 2289 (noting that the proper inquiry for the Court in that case was "whether Congress intended the FSIA to supersede the common law of official immunity").[8] The latter question is what plaintiffs' case hinges upon,

---

[8] Plaintiffs do not disagree with the Government's position that the TVPA does not "override[] the Executive's authority to make head of state immunity determinations." (Plaintiff's Letter dated June 6, 2012, at 2 (ECF # 37.)) Rather, they take the "more modest[]" position that the "the TVPA merely modifies the Executive's authority" in the instant case. Id. However, this distinction does not advance plaintiffs' position: whether the TVPA modified the

7

and unfortunately for them, the Second Circuit already rejected this position in Matar v. Dichter, 563 F.3d 9, 15 (2d Cir. 2009). In Matar, the Second Circuit held that a former foreign official alleged to have violated the TVPA, inter alia, was immune from suit under common law principles of sovereign immunity—that is, because the Executive Branch urged the court to dismiss the case on immunity grounds. Id. In so holding, the court in Matar rejected the appellants' argument that any immunity the defendant might enjoy was overridden by his alleged violations of the TVPA. See id.[9] To the contrary, the Second Circuit found that the TVPA was not meant to override common law immunity, and as a result, "the TVPA will apply to any individual official whom the Executive declines to immunize." Id. (emphasis added). Other courts that address the question of whether the TVPA overrides common law sovereign immunity have similarly answered in the negative. See, e.g., Manoharan, 2012 WL 642446, at *4 (noting "[t]he clear statutory purpose behind the TVPA was to maintain the common law doctrine of head of state immunity, not override it) (emphasis in original); Lafontant, 844 F. Supp. at 138–39 (noting "[t]he legislative history of the TVPA lends ample support for the proposition that the Act was not intended to trump diplomatic and head-of-state immunities); see also H.R. Rep. No. 102–367, at 5 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 88 ("[N]othing in the TVPA overrides the doctrines of diplomatic and head of state immunity.").

---

Executive's authority only in cases similar to the present one or in all cases involving the TVPA, the Court first asks the same question: did Congress intend the common law of sovereign immunity to survive the enactment of the TVPA?

[9] Matar was decided before Samantar settled the question of whether the FSIA applied to individuals as well as sovereign states. In affirming the dismissal of the complaint, the Second Circuit in Matar held that even if the FSIA does not apply to individual officials (which the Supreme Court had later determined to be a correct interpretation of the FSIA), the defendant was "nevertheless immune under common-law principles that pre-date, and survive, the enactment of the FSIA." Matar, 563 F.3d at 15.

In this case, in accordance with principles of common law immunity, the Executive Branch filed a Suggestion of Immunity urging the Court to dismiss the case against the Emir. Since the TVPA does not override common law immunity—and plaintiffs point to no other congressional statute or decision from a higher court that purports to do so—the Executive Branch's determination over the scope of the Emir's immunity is controlling here.[10]

The Court is disquieted by the possibility that, as plaintiffs warn, the Emir, as a life-tenured official with a residence in the United States, could forever escape accountability under the TVPA if granted immunity now, and that his victims could be left without redress. The Court is also mindful that such a result would contradict one of the stated purposes of the TVPA, which is to prevent state-sponsored torturers and human rights abusers from seeking safe haven in the United States. See S. Rep. No. 102-249, at *3 (1991) ("This legislation . . . [will ensure] that torturers and death squads will no longer have a safe haven in the United States."); see also Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 105–06 (2d Cir. 2000) ("[The TVPA] seems to represent a . . . direct recognition that the interests of the United States are involved in the eradication of torture committed under color of law in foreign nations."). However, as the district court in Manoharan observed, this "contradiction was recognized by Congress before the [TVPA] was enacted." 2012 WL 642446, at *4. More to the point, this contradiction was recognized by the Executive Branch when it specifically granted the Emir immunity for the crimes alleged herein. And "the Court is not in a position to remedy that contradiction." Id.

---

[10] Had the State Department not submitted a Suggestion of Immunity in this case, then the Court would have to wrestle with the "amorphous and undeveloped state" of the scope of head of state immunity as applied to the TVPA. See In re Doe, 860 F.2d 40, 44 (2d Cir. 1988).

9

## III. CONCLUSION

Accordingly, for the reasons discussed above, the Complaint is dismissed.

SO ORDERED.

Dated:   New York, New York

August 16, 2012

ANDREW L. CARTER, JR.

United States District Judge